986 F.2d 1422
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Irene C. STEEN, Petitioner,
v.
COMMODITY FUTURES TRADING COMMISSION, Respondent.
 No. 92-3268.
 United States Court of Appeals, Sixth Circuit.
 March 2, 1993.
 
 Before ALAN E. NORRIS and SUHRHEINRICH, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Irene Steen, a commodity futures investor, petitions this court following an adverse judgment on her reparation action. We affirm the Commodity Futures Trading Commission's March 3, 1992 Opinion and Order for the following reasons.
 
 I.
 
 2
 In December, 1982, Petitioner Irene Steen ("Steen"), an attorney, contacted Respondent Terry Parsons ("Parsons"), an account executive with Respondent Monex International ("Monex"), a "registered commodity trading advisor and leverage transaction merchant," Petitioner's Brief at 5, to open a non-discretionary (all trades must be approved by the customer) trading account with Monex.
 
 
 3
 On December 9, 1982, Steen purchased a silver leverage contract (1,000 ounces) at $10.56 1/2 per ounce. Steen forwarded a percentage of the purchase price to Monex to "margin the trade." Shortly thereafter, Steen executed Monex's "Commodity Account Agreement" which provided (in relevant part):
 
 Customer acknowledges and agrees:
 
 4
 1. That he has received, read and understands the attached Monex Offering Statement of February 1, 1983.
 
 
 5
 2. That his financial means and liquidity are suitable to sustain losses in an amount up to the full value of any and all transactions opened with Monex International, Ltd., and Monex Trading Corporation, including all interest, service and transaction charges.
 
 
 6
 * * *
 
 
 7
 4. That he will rely upon no guarantee nor upon any representation not included within Monex International, Ltd.'s or Monex Trading Corporation's authorized literature.
 
 
 8
 * * *
 
 
 9
 Customer and Monex International, Ltd., agree:
 
 
 10
 1. That this agreement supersedes all prior agreements, written or oral, between the Customer, Monex International, Ltd., and Monex Trading Corporation.
 
 
 11
 * * *
 
 
 12
 3. That this agreement constitutes the entire and whole agreement among the parties hereto and is intended as a complete and exclusive statement of the terms of their agreement.
 
 
 13
 Commodity Account Agreement at 1 (emphasis in original). The Monex Offering Statement contained direct warnings of risk in bold block capital letters.
 
 
 14
 On January 5, 1983, Steen purchased four silver contracts at $11.97 per ounce. On January 17, 1983, Steen purchased eight silver contracts at $13.71 1/2 per ounce. Steen's January 31, 1983 "Monthly Customer Statement" from Monex indicated that her contracts, to date, had accumulated $20,345.66 of unrealized profit.
 
 
 15
 On February 11, 1983, Steen purchased two silver contracts at $14.98 per ounce. Following a drop in silver prices, Steen liquidated fourteen of her fifteen silver contracts on February 22, 1983, resulting in a realized profit of $8,122.36. By the end of February, 1983, Steen's only remaining contract (her first silver contract) had an unrealized loss of $671.30.
 
 
 16
 On March 3, 1983, Steen purchased fourteen silver contracts at $11.45 1/2 per ounce. In April, 1983, Steen liquidated all of her contracts resulting in a realized profit of $12,349.18. On April 26, 1983, Steen placed a "market-if-touched" order which provided that Steen would purchase fifteen silver contracts if the silver market dropped to $11.00 per ounce. Steen's April 30, 1983 "Monthly Customer Statement" from Monex revealed that Steen "was completely out of the market with no open contracts," Commission's Brief at 12, and had realized profits of $20,471.54 since December, 1982.
 
 
 17
 On May 6, 1983, Steen cancelled the "market-if-touched" order and bought fifteen silver contracts at $13.26 1/2 per ounce. Steen's May 31, 1983 "Monthly Customer Statement" revealed that the value of Steen's fifteen contracts had decreased, resulting in a $2,344.95 unrealized loss. Steen liquidated her fifteen contracts on June 1, 1983, resulting in a realized loss of $15,169.95.
 
 
 18
 Steen reentered the market on June 7, 1983, purchasing fifteen silver contracts at $11.64 1/2 per ounce. Steen liquidated these contracts on June 27, 1983, resulting in a realized profit of $2,726.55. On June 29, 1983, Steen reentered the market by purchasing fifteen silver contracts at $11.98 1/2 per ounce. Steen's June 30, 1983 "Monthly Customer Statement" reflected that, since opening her Monex account, Steen had realized profits of $8,028.14 (and currently held $5,098.95 of unrealized loss).
 
 
 19
 On or about July 12, 1983, Steen elected to change account executives, replacing Respondent Terry Parsons with Respondent Thomas Birch ("Birch"). On July 21, 1983, Steen liquidated her fifteen outstanding silver contracts, realizing a profit of $5,776.05. Steen, once again without any silver contract holdings, had realized profits of $13,804.19 since opening her Monex account in December, 1982.
 
 
 20
 On July 22, 1983, Steen purchased eighteen silver contracts (her largest purchase thus far) at $12.72 per ounce. Silver prices quickly fell. By July 31, 1983, Steen had incurred unrealized losses totaling $16,984.80. Steen's eighteen contracts recovered somewhat during August, resulting in $14,464.80 of unrealized loss on August 31, 1983. During September,
 
 
 21
 Steen established a short position, selling 18 silver contracts at $12.37 1/2. Steen sent Monex $5,000 to margin the short contracts. The price of silver decreased, and Steen liquidated the short contracts for a profit of $4,196.16. Also during September, however, interest charges that Steen had prepaid on the 18 long silver contracts expired. Rather than liquidate the unprofitable contracts, Steen reestablished them on a short-term basis, sustaining interest charges on a monthly basis. Silver prices continued to drop. By the end of September, 1983, Steen's unrealized losses on the 18 silver contracts totalled $35,344.80.
 
 
 22
 In October, Steen received a margin call from Monex. She sold four of the silver contracts at $10.30 1/2 to meet the call. That sale lost $10,532.72. The market continued to drop, and on October 19, 1983, Steen liquidated the remaining 14 silver contracts at $9.41 1/2, for a loss of $48,478.50.
 
 
 23
 Steen then [closed] the account. Monex paid Steen $7,726.72, the remaining account balance, on or about October 20, 1983. All told, Steen sustained net out-of-pocket losses of $40,633.28.
 
 
 24
 Commission's Brief at 13-14.
 
 
 25
 On or about April 2, 1984, Steen filed a complaint with the Commission seeking $87,071.33 (consisting of diminution of equity balance, "[p]rofits made but lost due to failure to timely liquidate" silver contracts, and "[l]oss on liquidated stock" sold to invest with Monex) from Terry Parsons, Thomas Birch and Monex International arising from their "[f]alse promises, misrepresentations, fraud, mismanagement of account, failure to liquidate and use the stop limit order, hidden charges, illegal interest, creation of commissions and service charges, [and] breach of fiduciary duties." Complaint at 2.
 
 
 26
 On March 2, 1989, the administrative law judge ("ALJ") issued his findings (in relevant part):
 
 
 27
 The allegations set forth in the complaint raise several issues which range from a misrepresentation of the risk and profit potential to a failure to contact and advise Complainant on the adverse effects of the market moves against the account. It is apparent from the record that the central and single most important issue in this reparation action involves Respondents' misrepresentations concerning the risks and profits associated with Complainant's investment.
 
 
 28
 Respondent Parsons told Complainant that "enormous prices" were just around the corner in the silver market. During the initial and subsequent conversations, Parsons "practically guaranteed" profits and urged Complainant to forward a check for $2,860 to him and Respondent Monex "right away" to receive the benefit of the upward market price.
 
 
 29
 Respondent Parsons further promised Complainant that the price of silver would rise to $150 per ounce and advised Complainant to forward all the money she could get her hands on so that he would make a profit for her in the silver market.... Respondent Parsons told Complainant that she could make "hundreds of thousands of dollars" in the silver market. Respondent Parsons admitted, at the hearing, to his statements of profits to be made in silver. Respondent Parsons also admitted that Complainant always followed his recommendations and never directed or suggested her own transactions.
 
 
 30
 * * *
 
 
 31
 I find and conclude that Respondent Parsons and Respondent Birch violated § 31.3 of the Commission's Regulations and § 19(b)(1) of the Commodity Exchange Act through their statements of material misrepresentation to Complainant concerning the promise of profits and the failure to properly disclose the risks, charges, fees and commissions involved in the transactions. I find and conclude that Respondent Monex is liable for the violations of its employees, Respondent Parsons and Respondent Birch, under § 2(a)(1)(A) of the Commodity Exchange Act. I find and conclude that Complainant sustained $40,633.28 in damages as a direct result of these violations by the Respondents.
 
 
 32
 ALJ's March 2, 1989 Initial Decision and Order at 2-4.
 
 
 33
 The Respondents appealed the ALJ's findings to the Commodity Futures Trading Commission. On March 3, 1992, the Commission issued its Opinion and Order vacating the ALJ's Initial Decision and Order, and dismissed Steen's complaint:
 
 
 34
 [T]he ALJ determined that Steen's version of the evidence at issue was more credible than that offered by Parsons and Birch. As a general rule, the Commission defers to such credibility determinations in the absence of clear error. While there is room for disagreement with the ALJ's credibility assessment in this case, respondents have not established the type of clear error that warrants an exception to our policy of deference. On this issue, we defer to the judge's analysis of the factual record. Accordingly, we affirm his conclusion that respondents made misrepresentations of material fact.... Based on an independent review of the record, [however,] we conclude that complainant has failed to establish that respondents' wrongdoing was a proximate cause of the damages she claims in this proceeding.
 
 
 35
 * * *
 
 
 36
 We begin by rejecting Steen's claims that she was a naive investor who was easily misled by respondents. Complainant is well-educated and a practicing attorney. She had previous investment experience in common stocks, mutual funds, and brood mares. We find it incongruous that an individual with this background would testify that she ignored the bold print in risk disclosure documents and credited an account executive's oral claim that he knew the price of silver would rise from near $11 an ounce to a range of $100 to $150 an ounce. Indeed, complainant made repeated statements at trial that she understood that commodities trading was risky.
 
 
 37
 Complainant's approach to trading is also inconsistent with the suggestion that she believed respondent Parsons had some special ability to foresee the rise of silver prices to a range of $100 to $150 an ounce. The record shows that Steen traded like a savvy, rational trader, buying in dips and taking profits when she could. She repeatedly moved in and out of her silver positions and complained when Parsons failed to warn her of market retreats from the $15 level. Steen's proffered belief in a long-term rise in silver prices to ten times their then-current level is betrayed by a pattern of trading more like a speculator than an investor. Rather than "buying and holding," complainant seemed intent on capitalizing on short-term fluctuations by exiting and reentering the market within days.
 
 
 38
 Finally, by the time she switched her account to Birch, she was aware that respondents' market predictions had no special reliability. By July 22, when she made her [final] purchase, Steen had already made substantial profits, and experienced two significant market drops. She had realized profits of $25,347.70 and realized losses of $17,319.55. On July 22, taking into account unrealized profits of $4,800.00 in her account, her net profit since beginning trading was $12,828.15. We must necessarily impute to Steen the knowledge she gained from her seven-plus months of trading in a volatile market; from the severe market drops (and corresponding losses to her account); from the daily contact with her brokers or Monex's market quotation telephone service. Indeed, a transcript of a telephone conversation introduced at the hearing, and Steen's complaint itself, bear witness to our finding that Steen understood that, notwithstanding respondents' claims otherwise, the market cannot be predicted.
 
 
 39
 Based on the foregoing, we find that the weight of the evidence does not establish that the wrongdoing demonstrated on this record was the proximate cause of the damages suffered by complainant.
 
 
 40
 Commission's March 3, 1992 Opinion and Order at 10-14 (footnotes omitted). See also Id. at 17 (Chairman Gramm, concurring) ("[T]he record reveals a complainant who can legitimately be characterized as 'a sore loser.' ").
 
 
 41
 Steen thereafter timely filed her Petition for Review (pursuant to 7 U.S.C. § 18(e) which provides that "[a]ny order of the Commission entered hereunder shall be reviewable on petition of any party aggrieved thereby, by the United States Court of Appeals for any circuit in which a hearing was held").
 
 II.
 Standard of Review
 
 42
 Because "the findings of the Commission as to the facts, if supported by the weight of evidence, shall be conclusive," 7 U.S.C. § 9, we review the Commission's factual determinations using the preponderance of the evidence standard of review. First Nat'l Monetary Corp. v. Weinberger, 819 F.2d 1334, 1338 (6th Cir.1987). Specifically, this court's function "is something other than that of mechanically reweighing the evidence to ascertain in which direction it preponderates; it is rather to review the record with the purpose of determining whether the finder of fact was justified, i.e., acted reasonably." Id. at 1339.
 
 
 43
 The Respondents' Purported Fraud and Misrepresentation
 
 
 44
 "[T]he Commodity Exchange Act provides protection for fraud or misrepresentation on the part of commodity futures brokers." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1484 (6th Cir.1989) (Milburn, J., concurring). Specifically, the Commodity Exchange Act provides:
 
 
 45
 It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
 
 
 46
 (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
 
 
 47
 (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.
 
 
 48
 7 U.S.C. § 60(1). Moreover, the Commission's regulations provide:
 
 
 49
 It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:
 
 
 50
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 51
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or
 
 
 52
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in, or in connection with (1) an offer to make, or the making of, any transaction for the purchase, sale or delivery of silver bullion, gold bullion, bulk silver coins, bulk gold coins, or any other commodity pursuant to a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or pursuant to any contract, account, arrangement, scheme, or device that serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract, or (2) the maintenance or carrying of any such contract.
 
 
 53
 17 C.F.R. § 31.3.
 
 
 54
 Noting that "[t]he general fraud prohibitions cover fraud by any person in connection with a futures transaction on a contract market," Street v. J.C. Bradford & Co., 886 F.2d at 1484 (Milburn, J., concurring), the Sixth Circuit has determined that a commodity investor attempting to establish fraud must
 
 
 55
 show that the broker (1) misrepresented a material fact (2) which was intended to induce reliance, (3) that the investor reasonably relied on the misrepresentation, and (4) that the reliance was the proximate cause of his damages.... [A] misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.
 
 
 56
 Id. at 1484-85 (citations omitted). Accordingly, the Commission properly maintains that "a customer does not establish a right to recover losses merely by proving violative conduct; he must also establish that it is more likely than not that the violative conduct proximately caused the losses." Commission's Brief at 22.
 
 
 57
 The ALJ concluded that Respondents Parsons and Birch violated the Commodity Exchange Act, and the Commission's regulations, "through their statements of material misrepresentation to Complainant concerning the promise of profits and the failure to properly disclose the risks, charges, fees and commissions involved in the transactions." ALJ's March 2, 1989 Initial Decision and Order at 4. The Commission deferred to the ALJ's conclusion "that respondents made misrepresentations of material fact," Commission's March 3, 1992 Opinion and Order at 10, noting that "respondents have not established the type of clear error that warrants an exception to our policy of deference." Id. Though we question whether the respondents' statements may reasonably be deemed misrepresentations (as opposed to mere "puffing"), the answer is immaterial because, as the Commission properly found, Steen has failed to demonstrate causation.
 
 
 58
 Steen entered the silver futures market on December 9, 1982, by purchasing one leverage contract. Following months of aggressive (and largely profitable) trading, Steen purchased eighteen leverage contracts on July 22, 1983, in what was to be her largest, and least successful, silver futures investment. Prior to this final purchase, Steen had realized profits of $13,804.19 since opening her Monex account.
 
 
 59
 Because "the record supports the Commission's finding that Steen traded like a savvy, rational trader ... whose approach to trading was inconsistent with the suggestion that [Respondents] had a special ability to foresee the rise of silver prices to $100-$150 an ounce," Commission's Brief at 26, we affirm the Commission's March 3, 1992 Opinion and Order.
 
 III.
 
 60
 We AFFIRM the Commodity Futures Trading Commission's March 3, 1992 Opinion and Order for the aforementioned reasons.